# Mouton *v.* Louisville & Nashville Railroad Co.

*Action against Railroad Company as Common Carrier for Failure to Deliver Goods delivered to it for Transportation.*

1. *Pleading and practice; sufficiency of judgment upon demurrer.* The recital in a judgment entry upon a demurrer interposed to a special plea, that the "demurrer to the special plea * * * is by the court overruled," is not sufficient as a judgment upon the demurrer, and such ruling will not be reviewed on appeal.

2. *Same; motions to strike pleadings from file and rulings thereon shown in bill of exceptions.*—The motion to strike a replication to pleas, and the rulings of the court thereon, and the exceptions to such rulings should appear in the bill of ex-

[Mouton v. Louisville & Nashville Railroad Co.]

ceptions, and when not so shown such rulings will not be reviewed on appeal.

3. *Liability of common carrier; when can be limited by special contract.*—A common carrier may, by special contract, limit or qualify his liability as an insurer or his liability for loss occurring by unavoidable accidents, not only relating to the risks or accidents for which he would otherwise be answerable, but also as to the amount of damages for which he would be liable in the event of loss or injury, when it is shown that such limitation is made for the purpose of securing a reasonable and just proportion between his liability and his compensation.

4. *Same; burden of proof.*—A common carrier relying on exemption from liability for loss by fire of goods delivered to it for transportation, must show that the goods were destroyed by fire and that such loss was without fault on its part.

5. *Common carrier; when bill of lading executed by common carrier a special contract.*—A bill of lading given by a carrier on the delivery of goods to it for transportation, limiting its extraordinary liability, if accepted by the shipper or consignor with knowledge of its contents, or with reasonable opportunity of acquiring such knowledge, constitutes a special contract; and it is not necessary in order to make such contract binding between the parties, that it should have been signed by the consignor or shipper, or that the carrier should have been notified that its terms were accepted by the shipper or consignor.

6. *Same; admissibility of evidence to explain terms used in bill of lading.*—In an action against a common carrier to recover damages for failure to deliver goods delivered to it for transportation, where the bill of lading made out by the defendant and delivered and accepted by the shipper, after specifying the articles shipped, contains the words "K. D. & Released," it is competent for the railroad agent issuing such bill of lading to explain what these words meant; and the testimony of such agent in reference to the goods involved in the suit, which were wagons, that "K. D." meant knocked down, and that the wagons shipped were not set up in running order, and that the word "Released" meant that the carrier was released by the shipper from liability for loss not occasioned by the carrier's negligence, is admissible.

7. *Same; what sufficient consideration for release of liability as common carrier.*—Reduced rates given for the transportation of freight constitute a sufficient consideration to support a special contract, whereby a common carrier is exempt from

liability for the loss of goods during transportation, by fire, without the carriers' negligence.

8. *Action for negligence; when fact of negligence question for jury.* In an action seeking to recover damages for alleged negligence where the evidence is conflicting, or where, if not conflicting, different minds may draw different conclusions or inferences on the subject, the question of negligence is one of fact for the determination of the jury; and it becomes a question of law to be determined by the court, only when the mind is so free from doubt as that the inference of negligence *vel non* to be drawn from facts is clear and certain.

APPEAL from the Circuit Court of Lauderdale.

Tried before the Hon. E. B. ALMON.

This was an action brought by the appellant, A. E. Mouton, the successor of the firm of Moss & Mouton, against the Louisville & Nashville Railroad Company, for its failure as a common carrier to transport and deliver certain wagons delivered to it at Florence, Alabama, to be carried to Lafayette, La.

The defendant pleaded the general issue and a special plea, the substance of which is set forth in the opinion. To this plea the defendant demurred upon several grounds. The judgment entry upon this demurrer was as follows: "Comes the parties by their attorneys and the demurrer to the special plea filed in this cause on the 7th day of March, 1899, is by the court overruled." The other facts of the case necessary to an understanding of the decision on the present appeal, are sufficiently stated in the opinion.

Upon the introduction of all the evidence, the court, at the request of the defendant, gave the general affirmative charge in its behalf, to the giving of which charge the plaintiff duly excepted.

There were verdict and judgment for the defendant. The plaintiff appeals, and assigns as error the several rulings of the trial court to which exceptions were reserved.

JOHN T. ASHCRAFT and EMMET O'NEAL, for appellants.—When the appellant showed the delivery of the goods for him to the appellee, a common carrier, the

value of the goods; and, that they had been lost or destroyed, he made out a *prima facie* case and cast on the appellee the burden of proving: (1.) That the goods were delivered to it for shipment under a special valid contract whereby it should not be liable for any loss by fire.—*Wallace v. Matthews*, 39 Ga. 617; s. c. 99 Am. Dec. 473; *Steele & Burgess v. Townsend*, 37 Ala. 247; *S. & N. Ala. R. Co. v. Henlein*, 52 Ala. 606; *L. & N. R. Co. v. Touart*, 97 Ala. 514.

(2.) That there was a valid consideration moving it for such special contract, see 5 Amer. & Eng. Encyc. of Law, 298; *Duvenick v. R. R. Co.*, 57 Mo. App. 550; *Paddock v. Railroad Co.*, 1 Mo. App. 87.

(3.) That such contract was reasonable, see *Railroad Co. v. Lockwood*, 17 Wall. 357; 2 Amer. & Eng. Encyc. of Law, (1st ed.), 819; *S. & N. Ala. R. R. Co. v. Henlein*, 52 Ala. 606; *A. G. S. R. R. Co. v. Little*, 71 Ala. 611.

(4.) That the shipper had a real freedom of choice between the special contract and the right to ship under the carrier's common law liability, see *R. R. Co. v. Dill*, 48 Kan. 210; 55 Amer. & Eng. R. R. Cases, 375; *Railroad Co. v. Lockwood*, 17 Wall. 378; *L. & N. R. R. Co. v. Gilbert*, 7 L. R. A. 162; *Railroad Co. v. Mason*, 4 Kan. App. 391.

(5.) That the loss occurred without fault or negligence on its part, see *Steele & Burgess v. Townsend*, 37 Ala. 247; *Railroad Co. v. Lockwood*, 17 Wall. 357; *S. & N. R. R. Co. v. Henlien*, 52 Ala. 606; *L. & N. R. R. Co. v. Little*, 71 Ala. 611; *L. & N. R. R. Co. v. Oden*, 80 Ala. 43; *L. & N. R. R. Co. v. Touart*, 97 Ala. 514.

THOMAS G. & CHARLES P. JONES and ALEX C. BIRCH, *contra*.—The court did not err in refusing to exclude the shipping receipt or bill of lading when offered in evidence by the defendant. The fact that said shipping receipt was not signed either by the consignee or by any person authorized by them to sign the same, constituted no ground for its exclusion. "In the transportation of freight the bill of lading embodies the contract between the shipper and the carrier and when delivered to the

carrier and received by the shipper its terms, stipulations and conditions are as binding on the parties thereto as are the terms, stipulations and conditions of any other written contract." A bill of lading in its nature is both a contract and a receipt; as a receipt it should be signed by the party to be charged, as a *contract* it is unnecessary that it be signed.—*I. C. R. R. v. Frankenberg*, 54 Ill. 88; *Peidmont M. R. R. v. C. & G. R. R. Co.*, 19 So. Car. 353; *Adams Ex. Co. v. Haynes*, 42 Ill. 89; *C. H. & D. R. R. Co. v. Pontius*, 19 Ohio St. 22; *Baxendale v. Great Eastern R. R. Co.*, L. R. 4 Q. B. 224; 2 Rap. & Mack. Dig. Ry. Law, 167.

The fact that the plaintiff did not authorize the consignee to accept the bill of lading containing exemptions from liability from loss by fire, does not affect the validity of the special contract contained in the bill of lading, nor did it render such bill of lading inadmissible in evidence.—See *McMillan v. Mich. S. & N. I. R. Co.*, 16 Mich. 79; *Croycraft v. A. T. S. F. R. R. Co.*, 18 Mo. App. 487; *York Mfg. Co. v. I. C. R. R. Co.*, 3 Wall. 113; *Moriarty v. Harreden's Express Co.*, 1 Daly (N. Y.), 227; *Jennings v. Grand Trunk R. R. Co.*, 49 Am. & Eng. R. R. Cases, 98; 2 Rap. & Mack Dig. Ry. Law, 169. The Florence Wagon Works were trusted by the consignees to make the shipment, and were their agents for that purpose, and bound the owner by accepting any other ordinary contract of shipment.

It was admissible to explain what the terms "K. D." and "Released" used in the bill of lading meant.—*S. F. & M. R. R. Co. v. Collins*, 77 Ga. 376; 1 Rapalje & Mack Dig. of Railway Law, 614.

The reduced rates given constituted a sufficient consideration for a special contract entered into between the parties to this suit.—*Wayland v. Moseley*, 5 Ala. 430; *The Star of Hope*, 2 Sawry (U. S.), 15; *M. & M. R. R. Co. v. Jurey*, 4 Sup. Court Rep. 566; note 40 Am. & Eng. R. R. Cases, 93; 1 Rap. & Mack Dig. Ry. Law, 616.

The court did not err in giving the general affirmative charge requested by the defendant.—Black's Law & Practice, 233; *L. & N. R. R. Co. v. Touart*, 97 Ala. 514; *Railroad Co. v. Dill*, 55 Amer. & Eng. R. R. Cases, 375;

Hutchinson on Carriers, § 240; *Railroad Co. v. Weekly,* 8 S. W. Rep. 137; *Turrentine v. Railroad Co.,* 100 N. C. 387; *Anderson v. Railroad Co.,* 109 Ala. 129.

HARALSON, J.—1. The complaint is in Code form against defendant, for failure as a common carrier to transport certain described wagons, delivered to it at Florence, Ala., to be transported to Lafayette, La.

The defendant pleaded the general issue, and a special plea, that the property was delivered to it as a common carrier at Florence, Ala., under a contract expressed in the bill of lading, whereby it was stipulated and agreed that defendant should not be liable "for any loss thereof or damage thereto by causes beyond its control or by floods or fire," alleging "that while said property was in its posssesion and during the transportation, said property was destroyed by fire, and that said fire and said loss were not the result of negligence on the part of defendant."

There was a demurrer to this plea on several grounds, but no judgment thereon appears, and it will be treated as waived.

The plaintiff filed replications to this plea, " (1st.) That there was no consideration moving from defendant to the plaintiff for the special limitations limiting liability. (2d.) There was no consideration moving from the defendant to the consignor of the goods for the special limitations limiting liability, and (3d.) The bill of lading was not signed by the shipper or his agent."

The defendant moved to strike replications one and three, and the judgment entry shows, in proper form of judgment, that the motion was granted; but the motion, ruling of the court thereon and exception to the ruling, do not appear in the bill of exceptions.

The case was tried, therefore, on the general issue; on issue joined on the defendant's special plea, and on issue joined on the replications to defendant's said special plea. Stated in condensed form, the issues were, whether or not there was any binding special contract, such as is set up in said special plea; and if so, whether while the property was in the posession of defendant

and during its transportation, it was destroyed by fire, by the negligence of defendant; and, whether there was any consideration moving from defendant to the consignor of the goods for the special stipulation limiting defendant's liability for the loss of the goods by fire during transportation.

2. It was admitted, that on the 20th September, 1897, the Florence Wagon Works, the manufacturers of the wagons and the consignors, delivered to defendant at Florence one car of wagons, directed to Moss & Mouton, the consignees, at Lafayette, La., and that said car and goods were never delivered. The value of the wagons was also admitted, and that the plaintiff, A. E. Mouton, was the successor of said Moss & Mouton, and the proper party to bring the suit.

It was shown that the car was properly packed without waste or shavings, and that the wagons could not be very easily removed from the car by an inexperienced person, and could be much more easily removed through one door of the car, than through the other. They were taken to pieces for shipment.

This proof, without more, entitled the plaintiff to a verdict.

3. The carrier is liable at common law for the safety of the goods intrusted to his care for transportation, for injuries or losses which cannot be directly traced "to the act of God, or of the public enemy, or of the party complaining." To this extent, his liability is that of an insurer. But it is well settled, that the carrier "may, by special contract, limit or qualify his liability as an insurer, or his common law liability * * * not only touching the risks or accidents for which he is answerable, but also as to the amount of damages for which he will be liable in the event of loss or injury, when the purpose appears to secure a reasonable and just proportion between his liability and his compensation."—*A. G. S. R. R. Co. v. Little*, 71 Ala. 611. When relying on this exemption from liability for loss of goods by fire, delivered to it for carriage, the carrier must show that the goods were destroyed by fire, and that such loss was without fault on its part.—*L. & N. R. R. Co. v. Touart*,

97 Ala. 514.    The special plea of the defendant in apt terms sets up the exemption of defendant from his liability as an insurer in the transportation of the freight, and averred that the loss of the goods, was not the result of negligence on its part.

4.    The defendant introduced a bill of lading it signed for the freight, which contained the clause: "It is mutually agreed, in consideration of the rate of freight hereinafter named, as to each carrier of all or any of said property over all or any portion of said route to destination, * * * that every service to be performed hereunder shall be subject to all the conditions on the back of this receipt, which are hereby agreed to by the shipper and by him accepted for himself and his assigns as just and reasonable." (Here follows a description of the freight, with the names of the consignees, Moss & Mouton, Lafayette, La. Rate 43c, and was signed C. N. Jones, Agent.) On the back of this receipt, under the head of "Conditions," appears among other stipulations, the following: "1. No carrier or party in possession of all or any of the property herein described, shall be liable for any loss thereon or damage thereto, by causes beyond its control, or by floods or fire, or by quarantine," etc.

The defendant proved that the Wagon Works had, for its own convenience, its own bills of lading in blank, and made out the one offered in evidence in triplicate and sent them with the car when loaded to the agent to be signed; that the agent signed the three, one was kept by the railroad company, and two were returned to the shippers, one of which they retained, and the other they forwarded to the consignee. The plaintiff objected to the introduction of this receipt, or bill of lading, because it was not signed by the Florence Wagon Works, nor by the plaintiff; and because it was not shown that the plaintiff authorized the Florence Wagon Works to accept a shipping receipt or bill of lading, containing exemptions from liability by fire. These objections were without merit. Made out and accepted as a shipping receipt by them and acted on by them as such, it was not necessary to be binding on them, for them to sign the

same, nor to notify the carrier that they had accepted it. *Amer. O. Extract Co. v. Ryan*, 104 Ala. 274; *L. & N. R. R. Co. v. Fulgham*, 91 Ala. 555; 1 Parsons on Contr., 492, n. 1.   They, and not defendant, were necessarily the agents of the consignees for the shipment of the goods, and defendant was bound to ship by their instructions, as they did.   What the agreement between them and the consignees was, as to the sale and purchase of the goods, and how they were to be shipped, defendant had no means of knowing, and was not interested or bound to ascertain.   A bill of lading given by a carrier on the delivery of the goods to him for transportation, limiting its extraordinary liability is regarded as a special contract, if accepted by the shipper or consignor with knowledge of its contents, or, if reasonably prudent, with opportunity of acquiring such knowledge.—*A. G. S. R. R. Co. v. Little*, 71 Ala. 611; *Steele v. Townsend*, 37 Ala. 247.

5.   The bill of lading, as made out by the shippers under the head of "Articles," specifies the articles shipped, as "1 Car Farm Wagons. K. D. & Released." When the railroad agent, Jones, was being examined, he was asked by defendant what K. D. & Released, appearing on the bill, meant.   The plaintiff objected on the ground, that "it is the duty of the court to define and construe the meaning of words."   The objection was properly overruled, the principle invoked having no application to such signs and technical words as are here employed, and which are not in general use.   It was fully explained by Jones, defendant's agent and witness, and by J. C. Little, the plaintiff's witness, who made out the bills of lading, shipped the goods and sent the duplicate copy to the consignees, that "Released" meant that the carrier was released by the shipper from liability for loss not occasioned by the carrier's negligence, and the shipper gets a better rate of freight when it is released; that "K. D." meant knocked down, that is, that the wagons were not set up in running order, but taken to pieces when packed on the car.   It was further shown, without conflict, that the released freight charges to Lafayette were 43 cents per hundred pounds,—22

35

cents from Florence to New Orleans, and 21 cents from the latter point to Lafayette; and that, if the freight had not been reduced, 30 per cent. higher rate than 43 cents per hundred, would have been charged. It is well settled that reduced rates given for the transportation of freight is a sufficient consideration to support the special contract of exemption in case of loss by fire without the carrier's negligence.—*Western Railway Co. v. Harwell,* 97 Ala. 341; *L. & N. R. R. Co. v. Oden,* 80 Ala. 38; *York Co. v. C. R. R. Co.,* 3 Wall. 107; Hutchinson on Carriers, § 278; Code, § 1800.

In this connection it may be stated, that it was not proper for the court to allow this witness to state, that the classification and rates charged were approved by the Interstate Commerce Commission. If it was important to show the rulings and orders of that commission, higher and better evidence—the rulings themselves—was required, and they could not be shown by parol.

6. From what has gone before, the case is disembarrassed of the main questions involved except the one, whether or not the defendant used proper care to extinguish the fire, after its discovery. The contention on the part of defendant is, that the evidence is without conflict, and the general charge was properly given in favor of defendant on it, as well as on all other questions tried. This position is seriously controverted on the other side, on the law and facts.

The rule applying in such cases has been aptly stated to be, that "in all cases not free from doubt, either where the evidence is conflicting, or where it is not, and different minds may draw different inferences or conclusions on the subject, the question of negligence is one of fact for the determination of the jury. It becomes a question of law to be determined by the court, only when the case is so free from doubt as that the inference of negligence to be drawn from facts is clear and certain." *E. T. V. & G. R. Co. v. Bayliss,* 74 Ala. 151, 161; *City Council of Mont. v. Wright,* 72 Ala. 411; *Wilson v. L. & N. R. R. Co.,* 85 Ala. 269; 16 Am. & Eng. Ency. Law, 465, 468, and notes.

The burden of proving that the loss occurred without

the fault of defendant, as we have seen, was on it.—*L. &
N. R. R. Co. v. Touart*, 97 Ala. 514; *A. G. S. R. R. Co. v.
Little*, 71 Ala. 615.

7. It does not appear how the fire originated. From
aught appearing, it would seem due care had been exer-
cised on the part of the shipper and the carrier to pre-
vent the fire. The freight was, as shown, well packed,
without the presence of any inflammable material, in a
close, well constructed freight car, with no cracks or
apertures through which sparks could enter, until after
the fire originated. The doors were well closed and
sealed. It was shown by competent proof that the train
of cars was well equipped, and had a crew consisting of
the conductor, engineer, fireman and two brakemen, one
of them being a flagman. The car consumed, was the
eighth one from the engine, in a train of 18 cars. The
train left Decatur on its way south at 9 o'clock, the 4th
of October, 1897. It stopped at Blount Springs, where
there was a large tank, just on the roadside. The brake-
men and conductor inspected the train at this point, and
discovered no fire in it. It was five miles from Blount
to Reed's, the next station, and when the train was about
a mile south of Reed's, the conductor, as he testified,
being in the cupola of his caboose, looking over the train,
saw a blaze break out in the northeast corner of said
car, and the train was stopped as soon as it could be
done, at 12:15 o'clock a. m.; that he went over the top of
the cars, and descending near the one in which the fire
was, discovered fire coming from the inside, between the
tongues and grooves of the planks out of which the car
was constructed, the tongues having burned out; that
he pried the door open, but could not get the wagons out,
and chopped a hole through the roof, and as he stated,
had about a dozen buckets of water brought and poured
in; the fire was in the corner of the car, near the top,
and it was the wagons on fire; that they could do noth-
ing with it,—when they poured water on it, the fire
would go down a little, but before they could get back
it gained, and after a stop of 15 or 20 minutes, and find-
ing the fire was steadily gaining on them, they decided
to go to Warrior for help, and cut loose from the rest

of the train and ran to Warrior, distant about four miles; that they had been running about 18 miles an hour, the rules allowing 30. The seals on the doors, which he broke, were all right; they had three iron buckets on the train, holding a little more than a common water bucket, and the engine stack had a spark arrester on it. He also further testified that he went to Warrior because he had to get the train off the main line to let the passenger train, coming north, pass them; that it took eight minutes to run to Warrior; went into Warrior blowing fire alarm; stayed 20 or 25 minutes there, and turning the burning car over to the side track man he went back for the other cars left on the line near Reed's; that the fire was so hot at Warrior they could not get into the car, after having battered the door in with railroad iron, and the wagons were so packed in the car, they could not get them out, further than that a few pieces were pried out.

Seay, the flagman, testified that standing in the cupola with the conductor he saw the fire, which burst out like from a big pile of kindling; that he did not go to the burning car, but went back to the top of the hill, as the rules required him to do, to signal any train that might be coming behind them, the rule being, that if for any reason the forward train is required to stop it must send back the flagman, to flag any train that may be behind; that he stayed about 50 minutes when they called him in; that when they got to Warrior, about two-thirds of the top of the car was on fire, and 25 or 30 people were there.

Frank Smith, a brakeman, testified that after turning over the hill below Blount Springs, being on the 3d car from the engine, he saw smoke coming from under the edge of the roof of the car of wagons; that the swingman ran to tell the conductor, and witness ran to tell the engineer; that when he went back, there was no blaze coming out, and he could not get water from the bucket he brought with him from the tender into the fire; that the conductor then had them to open the door, when they saw the blaze in the back end of the car, but could not get to it; that he then went back to the engine

[Mouton v. Louisville & Nashville Railroad Co.]

and got a coal pick and cut a hole in the top, and when he did so, the blaze first came out, and he poured in a bucket of water, but the whole was not large enough and some of the water was lost; that they poured in five or six buckets of water, and the conductor said there was no use to try, as they could not put out the fire; that they had three buckets and he and Williams brought the water; that he did not think the engineer and fireman went back to the burning car; the buckets were of iron and held two gallons; that witness brought only two buckets of water from the engine and the swingman brought one from the caboose; that there was no water tank at Warrior, but there was a branch there, from which water could not have been brought fast enough to put out the fire.

. The evidence for defendant further tended to show that after the car arrived at Warrior, where they had no arrangements for extinguishing fires and with the appliances at hand, the fire could not have been extinguished.

We have been careful to set out, in as brief space as possible, the main features of the evidence bearing on the question in hand as delivered by the witnesses. It occurs to us, assuming that there is no material conflict in the evidence, as contended by defendant, that different minds might reasonably draw different inferences and conclusions thereform, as to whether defendant's employes by due care and diligence might or not have extinguished the fire when it was first discovered. This involves the other inquiries, whether they were dilatory or not in bringing water from the tank to pour on the flames at the place in the car at which the flame appeared at the time to be confined; whether or not they cut a large enough aperture in the roof through which to flood the fire when discovered, and whether they might not have used more water for the purpose than they did; whether or not, the conductor exercised good discretion in opening one of the doors of the car, which admitted fresh quantities of air to the flames; and whether or not it was best to go to Warrior, where there were no facilities for extinguishing the fire, or return to

[Bowling *et al.* v. Mobile & Montgomery Railway Co.]

Blount Springs, where there was a great tank of water susceptible of ready use in flooding the car, etc., etc. Under such a state of proof, the question of the exercise of due diligence on the part of the employes was one for the determination of the jury, and not for the court as a matter of law to decide.

We cannot, without extending this opinion to an extraordinary length, for no good purpose as it seems to us, follow the vast array of assignments of error not likely to arise on another trial. We have considered those most material, and in so doing have stated principles sufficient for the guidance of the court on another trial.

Reversed and remanded.